

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 1, 2023

**BY ECF**

The Honorable Alvin K. Hellerstein
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

     Re:    **United States v. Donovan Grant**,
                S1 21 Cr. 655 (AKH)

Dear Judge Hellerstein:

       The Government respectfully submits this letter in connection with the sentencing of defendant Donovan Grant, currently scheduled for Wednesday, March 8, 2023, at 10:00 am. In January 2014, the defendant planned to rob Jercar Brooks during a marijuana transaction inside of Brooks's apartment in the Bronx. When the robbery did not go as planned, the defendant shot Brooks in the face and leg, leaving him to die inside of the apartment. As part of his guilty plea, the defendant admitted that during the armed robbery, he intentionally shot and killed Brooks. The defendant was permitted to plead to one count of Hobbs Act robbery, resulting in a Guidelines range of the statutory maximum of 240 months' imprisonment. Given the gravity of the offense conduct, the Government respectfully submits that a Guidelines sentence of 240 months' imprisonment is necessary and appropriate in this case.

**Offense Conduct**

       The murder of Jercar Brooks occurred during an armed robbery of a wholesale quantity of marijuana. In 2014, the defendant and a co-conspirator (CC-1) agreed to rob Brooks, another marijuana dealer, during a marijuana transaction. (PSR ¶ 7). The defendant had a long history of dealing marijuana and of stealing from drug dealers. The defendant and CC-1 had known each other for several years, and they had previously worked together in defrauding drug dealers by providing counterfeit cash in exchange for the purchase of drugs. (PSR ¶ 7). In January 2014, CC-1 arranged for the defendant to purchase 10 pounds of marijuana from Brooks, with the understanding that CC-1 and the defendant would rob Brooks during this transaction. (PSR ¶ 8). On January 23, 2014, CC-1 picked up the defendant in a motor vehicle (the "Vehicle") from a residence located on Baychester Avenue in the Bronx, NY. (PSR ¶ 8). At the time, the defendant was in possession of a .357-caliber handgun. (PSR ¶ 8). The defendant and CC-1 also had an

empty messenger-style bag (the "Bag"), which they planned to fill mostly with counterfeit cash. (PSR ¶ 8).

On January 23, 2014, in the afternoon, the defendant and CC-1 drove together in the Vehicle to the prearranged location at 634 East 233rd Street in the Bronx (the "Building"), which was where Brooks resided. (PSR ¶ 9). The defendant and CC-1 met with Brooks outside the Building, after which the defendant and Brooks entered the Building. (PSR ¶ 9). Shortly thereafter, the defendant and Brooks returned to the Vehicle where CC-1 was waiting in order for the defendant to retrieve the Bag, which CC-1 handed to the defendant. (PSR ¶ 9). The defendant and Brooks subsequently reentered the Building and then entered Brooks's apartment. (PSR ¶ 9).

While inside Brooks's apartment, the defendant brandished his .357-caliber handgun and shot Brooks in the face and the right leg. (PSR ¶ 10). The defendant grabbed a large box containing marijuana from inside the apartment, before exiting the apartment and returning to the Vehicle. (PSR ¶ 10). The defendant and CC-1 fled the area in the Vehicle. (PSR ¶ 10). Brooks died as a result of his gunshot wounds. (PSR ¶ 10). Brooks was 36 years' old at the time of his death. (PSR ¶ 10).

On January 24, 2014, Brooks's body was discovered by friends who had gone to Brooks's apartment to check on Brooks. (PSR ¶ 11). The New York City Police Department ("NYPD") was subsequently contacted. (PSR ¶ 11). While processing the crime scene inside the apartment, the NYPD recovered five spent .357-caliber shell casings and three discharged rounds. (PSR ¶ 11). A subsequent NYPD ballistics report determined that the recovered spent shell casings and discharged rounds were fired from the same gun. (PSR ¶ 11).

## Procedural Background

A grand jury in this District returned a sealed indictment charging Grant with murder through use of a firearm, in violation of 18 U.S.C. § 924(j). On November 9, 2021, Grant was arrested by the Federal Bureau of Investigation in Atlanta, Georgia. (PSR ¶ 12). On August 26, 2022, Grant pled guilty before Magistrate Judge Cave to Count One of a Superseding Information that charged him with Hobbs Act robbery. The plea agreement provided, in relevant part, that "[t]he defendant agrees that his guilty plea to Count One will include his admission that on or about January 23, 2014, the defendant participated in an armed marijuana-related robbery of Jercar Brooks, and during the armed robbery, the defendant intentionally shot and killed Brooks."

## The Presentence Report

In the PSR, the Probation Office calculated the Guidelines range on Counts One consistent with the plea agreement. Pursuant to U.S.S.G. §§ 2B3.1 and 2A1.1, the base offense level is 43 because of the cross-reference to the first degree murder Guidelines. (PSR ¶ 25). Pursuant to U.S.S.G. § 3E1.1, the offense level is reduced by three levels for acceptance of responsibility. (PSR ¶¶ 32-33). Accordingly, the total offense level is 40. (PSR ¶ 34).

The Probation Office calculated that the defendant has zero criminal history points and is therefore in Criminal History Category I. (PSR ¶ 45). However, the defendant has had multiple contacts with the criminal justice system, as follows:

- In 2001, the defendant was convicted of criminal possession of a loaded firearm in the third degree, for which he was sentenced to 60 days' imprisonment and five years' probation.

- In 1997, the defendant was convicted in Kings County Supreme Court of assault in the third degree, for which he received a conditional discharge. (PSR ¶ 40).

- In 1990, the defendant was arrested for aggravated robbery in Dallas, Texas, for which no disposition is reported. (PSR ¶ 56).

- In 1990, the defendant was found not guilty after a bench trial of murder in Dallas County Criminal Court. (PSR ¶ 54).

- In 1990, the defendant had a pending murder charge dismissed in Dallas County Criminal Court. (PSR ¶ 52).

- In 1986, the defendant had an unlawful possession of a firearm dismissed in Dallas County District Court. (PSR ¶ 50).

- In 1986, the defendant was arrested for robbery in Dallas, Texas, for which no disposition is reported. (PSR ¶ 48).

In accordance with the above, the Probation Office calculated the defendant's Guidelines range as the statutory maximum of 240 months' imprisonment. The Probation Office recommends a sentence of 240 months' imprisonment. (PSR at 21).

## Discussion

Regarding the Court's contemplated sentence, the Government submits that a Guidelines sentence of 240 months' imprisonment is appropriate for the defendant.

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." *United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id*. at 596; *see also United States v. Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'")

3

(quoting *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting *Rita v. United States*, 127 S. Ct. at 2464-65)).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant; and

   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

*A Sentence of the Statutory Maximum is Appropriate*

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a sentence of 240 months' imprisonment is appropriate for the defendant.

First, a sentence of 240 months' imprisonment would reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The defendant intentionally shot and killed Jercar Brooks during the course of a marijuana robbery, firing five times inside of Brooks's apartment and ultimately striking Brooks in the face and the leg. The defendant then fled the scene with stolen marijuana, leaving Brooks to die. By his actions, the defendant showed a callous disregard for life, committing a senseless crime and taking a life in the process. In his submission, the defendant claims that the murder was "the consequence of a person who exercised bad judgment." (Def. Memo. at 2). But make no mistake about it—this was more than bad judgment. The defendant had for years engaged in marijuana dealing and associated robberies, and he chose to bring a gun with him to Brooks's apartment knowing full well that, in trying to rip Brooks off, he would need to use his gun. And that is exactly what he did, killing Brooks.

The victim impact statement of Brooks's child, contained in the Presentence Report, makes clear the terrible impact that this murder has had on the victim's family. (PSR ¶¶ 15-20). As his child described: "Death is so final. It is said that time heals but I am [sic] yet to see or feel this. Seven years ago, I was a third form student at prominent high school. It was there, I learned of the brutal death of my father, I knew in my heart something was wrong as we didn't hear from him the evening before. This shattered my world." (PSR ¶ 15). The victim impact statement describes how Brooks's family is still grappling with the loss of their father. The loss caused a cascade of consequences for the victim's family, resulting in constant anxiety and economic uncertainty. But most of all, the victim impact statement makes apparent the constancy of their grief. Brooks's child describes that "[p]ain knows no season and has no boundaries" and that "[h]e was our joy. He was our comfort. He was our confidant. He was our protector. I miss him so much." (PSR ¶¶ 19-20). There is no more serious offense than taking another's life. Brooks was only 36 years old at the time of his death, and he left behind a young family. (PSR ¶ 10). The Government respectfully submits that a sentence of 240 months would reflect the utmost seriousness of the offense and constitute just punishment.

Second, a Guidelines sentence is needed to protect society from future crimes of the defendant. The defendant focuses on stretches of time when he did not have any law enforcement contact, but the extent and nature of his contact with the criminal justice system is troubling. According to the PSR, the defendant's assault conviction stemmed from an incident in which he approached the complainant from behind and stabbed the complainant in the upper right shoulder, causing two lacerations and substantial pain. (PSR ¶ 41). The defendant's criminal possession of a firearm conviction occurred after he was found in possession of a loaded .40-caliber Smith & Wesson handgun. (PSR ¶ 43). And although he appears to have sustained no convictions from all of his criminal cases in Texas, those cases involved two sets of murder charges, including one where the charges were dismissed because the primary witness died and two other witnesses could not be located. (PSR ¶ 53). At the very least, these frequent contacts with the criminal justice system should have discouraged the defendant from returning to a life of crime, and yet, the offense conduct here reflects that, years later, the defendant had returned to crime as a way of earning a living.

5

Moreover, the defendant's contacts with the criminal justice system do not capture the years of drug dealing and robberies that he engaged in, but for which he was never caught. The defendant arranged to purchase 10 pounds of marijuana and planned to rob his victim with a firearm during this transaction. If anything, the defendant's lack of a criminal record suggests he had become better at committing crimes, choosing – as he did in the instant offense – to target drug dealers who would not readily turn to law enforcement to report the crime. The very offense conduct here suggests that the defendant was immersed in drug dealing and that he was willing and able to casually wield a firearm to commit a robbery, and, it undercuts the suggestion that this offense was an aberration in an otherwise law-abiding period of the defendant's life. (*See, e.g,* Def. Mem. at 17).

In his sentencing submission, the defendant requests a below-Guidelines sentence, but his arguments in support of such a sentence are without merit. Notably, the defendant claims that he is not trying to minimize his conduct, but his submission contains several statements designed to shift blame away from the defendant. The defendant claims that he took with him a firearm offered by CC-1, but the defendant brought his own gun to the robbery, as reflected in paragraph 8 of the PSR, which the defendant has not disputed. In addition, the defendant claims that he was previously robbed by Brooks, but the Government has uncovered no evidence to support that theory. Instead, the defendant chose to rob Brooks because Brooks was a marijuana supplier, CC-1 had a connection to Brooks and could arrange a transaction with Brooks, and the defendant had a history of robbing marijuana suppliers. The defendant and CC-1's ability to arrange a transaction with Brooks to purchase 10 pounds of marijuana itself rebuts the suggestion that Brooks had recently robbed the defendant. Presumably, Brooks would have been wary of inviting the defendant into his own apartment if Brooks had recently stolen from the defendant. And of course, the defendant claims that Brooks attacked him first, but there is nothing to corroborate that self-serving story because Brooks is dead.

The defendant also devotes much of his submission to discussing his difficult upbringing and the conditions of his pretrial confinement. The Government recognizes that the defendant was raised under difficult circumstances and that conditions in jails have been affected by the COVID-19 pandemic. But the defendant has already been given an extraordinary break in being permitted to plead to Hobbs Act robbery, reducing his statutory maximum from life or death to 240 months' imprisonment, and capping his Guidelines range as well. Any sentence below 240 months would not serve the purposes of sentencing.

Finally, the Government respectfully requests that the Court enter an order of restitution in the amount of $6,911.75, representing the cost of Brooks's funeral paid by his family.

**Conclusion**

      For the foregoing reasons, the Government submits that a Guidelines sentence of 240 months' imprisonment is warranted to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
     Jason M. Swergold
     Mollie Bracewell
     Assistant United States Attorneys
     Southern District of New York
     (914) 993-1963
     (212) 637-2218

cc:    Defense counsel